# THE

# MISCELLANEOUS REPORTS

OF THE

# STATE OF NEW YORK.

COMMENCING JANUARY, 1919.

---

GEORGE BAUER, Claimant, v. STATE OF NEW YORK, Defendant.

(Court of Claims, January, 1919.)

Damages — state not liable for, although negligent — evidence — lands overflowed by reason of cloudburst.

Where as a result of a " cloudburst" on the early morning of June 18, 1916, there was a freshet of " Mud creek " at and near its entrance into the Barge canal which caused the creek to overflow its banks adjacent to claimant's premises, flooding eleven and one-half acres of his farm to his damage, the omission of the state, after diverting the creek into the canal, to take adequate means to dispose of such water as was to have been anticipated from it, constitutes negligence.

The normal depth of the water in the canal was twelve feet irrespective of the water of the creek, which, before the washout, increased its depth to fifteen feet. The washout reduced the water to nine feet and there escaped not only the three feet of flood water from the creek stored in the canal level but also three feet of the normal body of water in it. *Held,* that though because of the state's culpability a tremendous quantity of water other than the natural discharge of the stream was precipitated into the creek and upon claimant's premises he was not necessarily entitled to recover damages, it being clearly evident that there would have been a flood of greater or less magnitude affecting claimant's premises on the morning in question irrespective of fault on the part of the state.

1

The state by cross-examination and affirmative proof showed that a natural flood would have affected plaintiff's premises at the time in question regardless of the state's negligence which added a large volume of water to the natural flood. *Held,* that the proof as it then stood left it unestablished whether the negligence of the state caused any part of the damage and the burden was upon plaintiff to proceed and show that his damages resulted proximately and were due solely to the negligence of the state, or if not, what part, if any, was so caused, and, in the absence of further proof, the claim should be dismissed.

CLAIM for damages caused by the flooding of claimant's land.

Wilford T. Purchase and Ernest F. Fox, for the claimant.

John H. Clogston, deputy attorney-general, for state of New York.

CUNNINGHAM, J.  Ganargua river, otherwise and more appropriately called Mud creek, rises in the Bristol hills and flows thence to the barge canal near Palmyra, a distance of twenty-eight miles.  Before the construction of the barge canal, the creek flowed easterly under the Erie canal, and thence sluggishly and tortuously, in an easterly direction, along the lands of the claimant several miles beyond.  When the barge canal was built the creek was taken into its prism just easterly of the Palmyra lock.  By-passes were provided in the canal below the Palmyra lock, in order to take care of certain mill rights along the creek.  They were designed to carry the ordinary discharge of the creek back into its old channel past these mills.  Further east of Palmyra and these by-passes, a spillway equipped with gates was constructed.  It is known as Harrison's spillway.  It was designed to provide an

exit for all flood waters of the creek taken into the canal, and to provide an outlet for all discharge of the creek above normal. Its crests and gates were planned to effect this result. The spillway discharges into the natural channel of the creek, which winds its way into proximity to the canal at this point. Thence the creek pursues its natural and original channel to the claimant's premises.

The barge canal in June, 1916, was completed and in operation from a point west of Palmyra easterly to a point east of Newark. There it connected with the prism of the old Erie canal, whose dimensions were, of course, much less than that of the barge canal, being at this conjunction point about eight feet deep and between forty and fifty feet wide.

Between Palmyra and Newark is Port Gibson; Palmyra is about two miles from Harrison's spillway, the latter is about one and a half miles from the herein mentioned washout near Port Gibson, and the last is several miles from claimant's premises.

The spring of 1916 was unusually wet. On the night of June sixteenth and the early morning of June seventeenth there was a tremendous precipitation in the watershed of Mud creek, in the Bristol hills. Various witnesses described the downpour as one of the heaviest rain storms within their recollection. It can be said fairly to deserve the term " cloudburst," which was applied to it. Bridges were destroyed, landslides precipitated, boulders unearthed, and farms and highways inundated, all due to the rapidly rising and overflowing waters of the creek. As a result, on the morning of June seventeenth there was a freshet of the creek at and near the point of its entrance into the barge canal. It left its banks, extensive areas of adjacent " flats " were flooded, and it dashed with great velocity into the canal, tearing out the rip-rap, rushing

Court of Claims, January, 1919.     [Vol. 106.

over the canal bank, and depositing a sand bar in the canal, which afterward impeded navigation until dredged out. This tremendous deluge precipitated into the canal raised its level rapidly. A great volume of water poured over Harrison's spillway, and into the channel of the creek below it. The water elevation of the creek, ordinarily twelve feet below the spillway, was raised until it was only eighteen inches below. The state employee in charge was unable to open the spillway gates, because when he arrived there, the water was so deep over the crests that the gate mechanism, situated between them, could not be operated, there being no bridges over the crests to it.

Some water was being fed from the canal west of Palmyra through the Palmyra lock, but its volume was not established, and it is of insignificance to this inquiry. Water was being discharged into the Erie canal as rapidly as the latter could receive it, but it would take very little and afforded an outlet of negligible importance. The water rose until it flowed over the bank of the barge canal at various places, particularly at a point near Port Gibson. As a result, about two hundred feet of the bank there was washed out, discharging from the canal a vast quantity of water and reducing the level, from a depth of about sixteen feet throughout its area, to about nine feet. This water filled an extensive expanse of land between the canal and the West Shore Railroad embankment, which impeded its progress. It escaped from this area through a large earth culvert in the embankment and thence along the channel of a brook into Mud creek at a point several miles west of the claimant's property.

On the early morning of June eighteenth, the creek overflowed its banks adjacent to claimant's premises and flooded eleven and one-half acres of his farm, causing him a loss of $200.

This case may be of importance to other claimants interested similarly in this event, and for that reason we will discuss our position somewhat fully. There are three questions involved: 1. Was the state negligent? 2. Did that negligence cause an increase in the volume of water in the creek at the claimant's premises, over what it would have been otherwise and naturally? 3. Does the state of the evidence establish the state's liability for all or any part of the claimant's damages?

We have little difficulty in concluding that the state was negligent. The claimant presented evidence to establish that at the point of the break the canal bank foundations were insecure, its piling defective and its compacting deficient. However, these things, if true, had nothing to do with the break and flood. The bank did not burst. In fact, it was not a " break " at all, but rather a washout. Any reasonable or proper earth construction would have washed out. Due care did not require a bank which would resist successfully the overflow of a large volume of water. But the state was negligent in diverting the creek into the canal, and failing to make reasonable provision for the safe disposition of such volume of discharge through it, as reasonably ought to have been foreseen and anticipated. A discharge such as this, excessive and infrequent though it was, was not such that the state was not bound to anticipate it. In the previous month substantially the same or a greater flood was experienced. The Erie canal afforded no considerable outlet and the by-passes and spillway were demonstrated in actual use on this occasion to be inadequate. Then, too, the gates were negligently inaccessible. In short, the state diverted the creek into the canal, and then omitted to take adequate means to dispose of such water as was to have been anticipated from it. The

Court of Claims, January, 1919.    [Vol. 106.

overflow and washout of the bank at some point was inevitable. The state's course and omissions were negligence.

Our second inquiry must be answered affirmatively. The normal depth of the water in the canal was twelve feet, irrespective of the water of Mud creek. Before the washout, the creek increased its depth to fifteen feet. The washout reduced the water to nine feet. Thus escaped, not only the three feet of flood water from the creek stored in the level but also three feet of the normal body of water in it. Obviously the volume released was very large. A tremendous quantity of water, other than the natural discharge of the stream, was precipitated into the creek and upon the claimant's premises, because of the state's culpability.

But these circumstances do not entitle the claimant necessarily to a recovery. Recently, this court applied and restated the principles applicable to a determination of liability, where the claimant's damages followed the concurrence of a natural flood, with one resulting from the state's remissness: In *Cooper* v. *State of New York*, 103 Misc. Rep. 209, we said: "(1) If none of the claimant's damage would have occurred, except for the negligence of the state, the state is liable for it all; (2) If all of the claimant's damage would have happened irrespective of the state's negligence, the state is not liable for any of it, although its negligence may have contributed thereto; and, (3) If any part of the claimant's damages would have resulted, irrespective of the state's negligence, for such part of the damage the state is not liable; but the state is liable only for the difference between the total amount of the claimant's damage, and that part of it which would have resulted, irrespective of the state's negligence. In the latter case, great difficulty in apportioning responsibility in any given case

probably will be met, but that difficulty is not a bar to recovery. It is the duty of the court to apportion it, as best it can from the proof, and much license will be accorded the trial court in its effort.''

We based this analysis upon previous decisions in the appellate courts. *Carhart* v. *State of New York,* 115 App. Div. 1; *O'Donnell* v. *City of Syracuse,* 184 N. Y. 1; *Ostrander* v. *State of New York,* 192 id. 415. We have applied these principles very recently in a case similar to the one at bar. *Harter* v. *State of New York,* 106 Misc. Rep. 9.

It is clearly evident that there would have been a flood of greater or less magnitude, affecting the claimant's premises on June 18, 1916, irrespective of the state's fault. It was conceded that the claimant's premises were flooded each spring, and had been for many years, by the natural rise of the creek. He alleged in his claim that his premises were flooded also, in the freshet of the previous May. There was a conflict among the witnesses as to whether the May flood or the one in question was the higher, but it is certain that at other points on the stream above the canal they were approximately equal. It was testified, and is conceded, that at these places both the May flood and June flood were much higher than the annual spring floods. It is obvious, therefore, that if the spring freshets overflowed the claimant's premises, and if the May flood did so the flood of June, greater than the former, and approximately the same as the latter, would have had the same result.

From this point both parties refused to make further proof. The claimant contended that the burden was upon the state to proceed from this point, and to establish, either that all of the claimant's injury and damages would have occurred irrespective of its negligence, or that a part of the loss would have resulted

from the natural flood, irrespective of the state's negligence, and in the latter event, the part or proportion which thus would have occurred, and by subtraction of the latter from the total damages, the part only for which the state is liable. The state contended that having shown by cross-examination and affirmative proof that a natural flood would have affected the claimant's premises at this time, irrespective of any negligence on the part of the state, and this state of the proof leaving it unestablished whether the state's negligence caused any part of the injury at all, the burden was upon the claimant, as a part of his duty to establish his cause of action, to proceed and show that the claimant's damages were due solely to the state's negligence, or, if not, what part, if any, was so caused, and in case of failure to meet this burden, to suffer dismissal of his claim.

In brief, the evidence, as it stands, shows that there would have been a natural flood affecting the claimant's premises, regardless of the state's negligence, and that the state's negligence did add a large volume of water to this natural flood. But it does not appear whether or not the natural flood alone would have caused none of the damage, or all of it, or part of it, and if part of it would not have resulted, except for the state's negligence, the proportion, extent or amount of that part.

Of course in some respects such a situation is very unsatisfactory to the court but we have to meet situations as we find them. We agree with the state's contention that the claim must be dismissed, because the claimant has failed to prove his claim. A claimant must establish all the essentials of his claim by a preponderance of the evidence. The burden was upon this claimant, not only to prove that the state was negligent, but that his damages resulted proximately and

solely from that negligence. This question was involved directly in the claim of *Harter* v. *State of New York, supra.* We dismissed that claim, saying: "If the state was responsible for any portion of the damage, the claimant failed to offer any evidence to establish that fact or that portion. The burden is upon him to prove all the essential elements of his case. He not only has failed to afford any proof of the extent of the state's liability, but also, that the state is liable for any part of the loss at all."

All motions made at the trial, decision upon which was reserved, are denied. The claim is dismissed.

ACKERSON, P. J., concurs.

Claim dismissed.